Good morning. We have one appeal to hear this morning. Counsel, we're familiar with your case, we've read your briefs, the authorities cited in your briefs, at least portions of the record. You have a little more time than oral advocates ordinarily get, because you have 30 minutes aside, but even so, time is limited. Pay attention to the traffic lights. If the red light shines, it's time to wrap it up, but if you're answering a question from the court, you won't lose rebuttal time in answering the question. Our case this afternoon is Mungin v. Secretary of the Department of Corrections. Mr. Scherr, will you please come and speak with us? Excuse me, good afternoon, may it please the Court, Counsel. My name is Todd Scherr, and together with Leor Villeneuve at the table from the Capitol Habeas Unit in Tampa, we represent Anthony Mungin in this 2254 appeal from the denial of Scherr, could you pick up the microphone? Sorry. Is that better? That's better. Okay. Thank you. We're hearing, of course, an appeal from a denial of a 2254. This Court delineated several issues it wanted briefing on in terms of when it granted the COA. I'm hoping to address, obviously, all of them given the time that we have. I would first like to address the first question, which is a compendium of several ineffective assistance of counsel subparts to a more global claim. Some of them there was no COA granted on, but the three, of course, that are before the Court all really relate to the same type of issue, which is the underlying credibility and accuracy of the identification of Mr. Mungin made by the key witness of trial, Ronald Kirkland. And one thing I want to, sort of, which I think are a couple of facts that oversee the unique to this case is, number one, the Florida Supreme Court in the direct appeal found insufficient premeditation for the jury's first-degree murder verdict, finding that, at best, it was a felony murder case. This also was, although there's no penalty claims before the Court, this was also, as capital cases go, a relatively unaggravated case. There were two aggravators. One was a prior felony, and one was during the course of a burglar, excuse me, of a robbery with pecuniary gain merged, and the ultimate sentencing recommendation was seven to five. So with that being said, these are, I think, sort of guiding principles when the Court looks to particularly the prejudice prong as it relates to the three ineffectiveness claims. Each claim has, as sometimes happens, different standards of review based on how the Florida Supreme Court addressed or didn't address them, and I'll go just address those briefly. The first claim, which was the ineffectiveness with respect to the adequacy of counsel's impeachment of Ronald Kirkland, the Florida Supreme Court did not address the deficiency prong, so that would be reviewed de novo. It did address the prejudice prong, so that would be, of course, subject to the limitations of the ADPA. As to the second claim, the failure to present the testimony of Detective Kahn, both of those prongs were addressed by the Florida Supreme Court, so that would be subject to the ADPA. The third issue is trial counsel's failure to investigate and present testimony from George Brown. That ineffectiveness claim was not addressed by the Florida Supreme Court, so it's our contention, and I don't think there's any disagreement from the Respondent in terms of that the standard of review would be de novo on that particular case. Can I ask you a question about that? I find that third claim to be the hardest one to conceptualize. So usually when we're asking, I guess you would agree that the Court denied the claim, right? I mean, they didn't grant relief on the claim, so they denied it. So would it be a summary, summary affirmance, would that be the way we would look at what happened on that claim? In the Florida Supreme Court, you mean? Yes. Well, what happened with that claim is that the Court first, the Circuit Court first reversed it, right? Correct. Only on the Brady and the Giglio claims. So the evidentiary hearing that subsequently took place only related to the Brady and the Giglio claims. So once the Strickland claim went up with the initial appeal from that denial, there's nothing else to do with that Strickland claim. In State court, it was waiting for the Federal court, you know, to raise it at that point. Yeah, I guess, and that's my question, is that usually in a situation where we're applying de novo review to a claim that was litigated in State court, the reason we're doing that is because the State court denied that claim on something other than the merits, right? So the issue is the State court said, this is procedurally defaulted or something like that and never reached the merits. Here it seems like your argument is that you lost, but there was just no explanation for why you lost. Well, it just, and it does happen that, you know, it was clearly an issue that was raised and adjudicated and the Florida Supreme Court just didn't address it. That does happen. And when the issue is exhausted and presented to the State courts in all the proper ways it's supposed to be, and the State court doesn't address it, that requires de novo review. If they did address it. What's your best case for that, that when a State court denies relief but doesn't address the specific claim, that we review that claim de novo? You know, we really didn't brief it because I don't think there was a dispute with the review. I mean, Wiggins, I know, talks about sort of when there's a hybrid ruling, and I'm fairly certain there may be some language in Wiggins about, you know, when a State court doesn't address the Federal claim, it's de novo because only a claim that's decided on the merits by the State, the highest court in the State. But if it's rejected, it is decided on the merits. True. True. In that sense, yes. Yeah. I mean, we're not saying — The Supreme Court case law about summary decisions is that they're entitled to deference. It's the decision which here is an affirm. Now, it may be when you have a trial court ruling that offers some explanation, then we have the Wilson look-through rule, but absent that, it's still a decision. It's still a decision. Correct. And even, you know, I think as we argued, maybe in the reply brief, even if you were to look through what the trial court's order was, didn't really say anything in terms of the Strickland aspect of that. So other than just sort of a denial of the claim without addressing the two prongs, there's nothing to really look through and to in order to give this Court some guidance. But then we give the State court the decision, the benefit of the doubt that it knows the law and that it understood and applied Strickland, and we do this Harrington hypothetical inquiry, don't we? You know, could — is there any basically reasonable explanation for why it could have been denied? Right. No. I mean, definitely there's obviously layers of deference that are afforded to these things under the sort of, in my view, ever-Byzantine rules with respect to how this Court or reviewing court looks at these types of unanswered or unexplained issues. But the district court certainly did address both of those prongs of the Strickland claim for whatever it's worth. And so I think this Court should do the same, mindful of the fact that there was never any evidentiary development on that particular Strickland claim as it relates to George Brown. Didn't the State circuit court, though, reject the Brown-related Strickland claim on prejudice grounds? No. I don't believe so. It rejected it because it was a summary denial. The Strickland claim was initially — that 3051 motion, which had all of the claims in it, was summarily denied. On appeal, the Flortsman Court reversed only on the Brady and ineffectiveness claims. And certainly, you know, the substance of George Brown's information was addressed by the State court — excuse me, by the circuit court and by the Flortsman court in the context most specifically as to the newly discovered evidence and as to the Brady claims. But part of our argument here on appeal, for example, when you look to the district court's merits ruling on both of those prongs, you know, the district court, we submit, makes sort of some suppositions or speculation about why counsel didn't further pursue or didn't present George Brown's testimony of the trial. For example, what did come out at the hearing was that there was — When you say the hearing, you mean the hearing in front of the State court on the Brady claims? Correct. Correct. Just want to make sure I understood. Yes. You know, what the district court did was looked at some of the information that came out at the hearing on the Brady claim and then looked, obviously, at the trial record. And what the district court pieced together was that there was an initial attempt to depose or to subpoena George Brown for deposition, I believe it was in June of 19 — several months before — it was six or seven months before trial. I think it was in June of the previous summer. Brown could not be located and couldn't be served. From that point, defense counsel then filed a motion for a better address. The problem is that that motion was never heard until January of the following year, which was about two weeks before trial. And, of course, at that point, it was too late. And I don't even think there was never a better address given because all the State had was the address that they previously had provided. What the district court decided was that, well, counsel must not have wanted to even locate George Brown, much less present what he had to say, because he essentially got that same information from Detective Kahn, who he had deposed the previous June. But, of course, that's not what trial counsel said. He didn't say anything because there was never a hearing as to why he didn't continue to pursue George Brown. But what we do know from the record, which the district court overlooked, was that counsel could not have made a decision to not continue to look for George Brown because he asked for a better address, motion to compel, and the motion was ultimately scheduled for hearing. Of course, by then, it was essentially too late. It was right before the trial. So counsel could not have decided that, well, I know what George Brown is going to say from Detective Kahn when he later tried to get a better address for George Brown. Can I ask you a question? Can I ask you a question about Brown, which also goes to the fourth issue, which is the statute of limitations? So the State raises the statute of limitations as a basis to reject your attempt to amend to add another claim about Gillette, I think Detective Gillette. And they also raise it on this claim as well and say that because this claim was added to the case, I forget the exact dates, but basically added to the case outside of the statute of limitations, that the statute of limitations bars both claims. What do you say about that? I'm not entirely sure that they raise the statute of limitations argument as to the George Brown. I know there's a discussion that it wasn't adequately exhausted in the State's view. Well, they do. They raise it as to Brown. That's entirely possible. What I would note, however, is that they did not raise that in the district court. When the judge allowed the second amended petition, which was sort of the operative one that he ultimately ruled on, the State never raised any defense or anything in terms of relation back or any sort of statute of limitations concerns with respect to the George Brown claim. It only raised what it really sort of raises here, which is the adequacy of how the claim was presented, which ultimately the district court at least silently rejected that because he did go ahead and address the merits. As to the court wants to get into the amendment claim, yes, they do argue that the statute of limitations would be violated by allowing that amendment to go through. Our argument, of course, and they also, of course, argue that it doesn't relate back, which is a sort of companion argument to the statute of limitations. The district court sort of didn't, in our opinion, do the correct analysis when it looked to the Gillette claim because the Gillette claim had three prongs to it, a Brady claim, a Giglio claim, at least in Federal court. It had a Brady claim, a Giglio claim, and a Strickland claim, and what the district court said when it, excuse me, when it looked at the relation back issue was that, of course, going back to the original petition, the July 2006 first timely petition, that petition didn't have any claim about Gillette. And because it didn't have any claim about Gillette, nothing else ever about Gillette would be timely. And that, of course, is a very unduly, well, crabbed, might be an understatement, sort of view of relation back and what constitutes sort of an operative set of facts in terms of when you look to the relation back doctrine as to a particular claim. And what's curious is that the district court didn't, when it analyzed the relation back issue, it didn't parse out the various claims. For example, it just had a global, very sort of, in my view, conclusory determination that there was no relation back, again, because the first petition said nothing about Gillette. But it did not go through the Brady aspect, the Giglio aspect, and the ineffectiveness aspect. And the ineffectiveness one is, of course, the only one that's before this Court, the way that the Court wrote the question. Let me ask you this. I mean, how is, how does Gillette relate back? And I guess I see that, I'm going to ask the other side about Brown and the statute of limitations, but on Gillette, what's your argument that it relates back to your original petition? Well, as we indicated, I think it was more specifically in the reply brief and also in the pleadings in the district court, the initial petition had a global ineffectiveness claim with respect to the reliability of the outcome at the guilt phase. One was about jury selection, which is not before the Court. Then there was the claim about Kirkland. There was the claim about the failure to call Detective Kahn. There was a failure to investigate and present exculpatory evidence, namely an alibi defense. So the claim about Gillette, the ineffectiveness aspect of that claim comes from the same operative core of facts as those initial ineffectiveness allegations from the initial petition. It's the same, you know, it's not just the same trial, but it's the same claim. It's just sort of a different aspect of the same claim. The Brady claim and the Giglio claim, which aren't before the Court, I think is a different argument. But certainly as to the ineffectiveness claim, that does relate back. And of course, so hypothetical, so I mean if I raise a claim and say, you know, in a case like this when my lawyer was ineffective at the guilt phase, you know, and there are three parts to that. One is that he didn't cross-examine a witness right. The other is that he didn't discover some information that he should have discovered. And, you know, three is that he didn't do some investigation that he should have investigated. And then I want to raise a fourth kind of prong or fourth allegation about why he was ineffective. You're saying that that necessarily relates back to the kind of the global ineffective claim? Is that what you're saying? I mean, it might. It might not. It just depends on an analysis that the district court here didn't perform. And, you know, when an issue was before this Court on the denial of a leave to amend, you know, the district court has to provide substantial reasons for not allowing the amendment. And here there was none of that other than the fact that the initial petition said nothing about Gillette. I mean, I can see that it didn't say anything about Gillette. But the types of ineffectiveness allegations, we're talking failure to investigate and present sort of exculpatory type of information, which was part of the initial the Strickland part of the Gillette claim. Failure to question or investigate Gillette in terms of the provenance of these shell casings. Of course, the shell casings were a great part of the State's case. And also the alibi allegations, which were raised in the initial habeas, also were And it was an exculpatory explanation. So they all really go together in terms of the Gillette claim, the Brown claim, and the other claims because they really go to not just Kirkland's credibility, but the sort of reliability of the State's case in general. So I do think that they operate out of a same core of operative facts. This is not a case like Mayo, for example, Mayo v. Felix, which involved two separate You know, normally when you see these types of claims, they are involving two completely different sets of circumstances. And the argument is just because they all relate from the same trial or the same proceeding, sometimes you see an argument being presented by petitioners that that means it's the same core of operative facts. We don't have that here. We have a much more, in my view, cabined type of ineffectiveness claim that does relate to those particular ineffectiveness allegations from the first petition. And I know that in our brief, I think we had mentioned, you know, we had addressed the second amended petition. And, of course, obviously, the relation back analysis goes to the original petition. But the same arguments really, you know, would apply to both. And so we do submit that the district court did abuse its discretion in denying leave to amend. You know, once the relation back factors are met, then there's no discretion to not, you know, grant leave to amend. And that's what happened here. And so we submit at least as to that claim. You know, I think if the Court were inclined to send it back, I think probably what I would think would be a reasonable outcome would be maybe to hold the other claims in abeyance and send this back. Because, obviously, I think the Court would want to address the entirety of all of the claims on their merits together as opposed to in a piecemeal fashion. One of the things that bothered me is if a Court could have reasonably concluded that a jury would have convicted your client without the Kirkland evidence, wouldn't that mean all the Strickland claims fail since they are all tied to evidence impeaching Kirkland? Well, I think that's a legal conclusion. It's de novo review, so you certainly wouldn't, you know, defer to that in the sense of, I mean, that's the situation in every single case, that there's something, you know, to sustain. Just because there's enough evidence to sustain a conviction doesn't mean that the jury's failure to be presented with an opposing set of circumstances could undermine confidence in the verdict. We don't have to show that it would have been acquitted. All we have to show is that confidence is undermined. Yeah, but, I mean, the premise of my question is, is that the Court, is that the jury would have convicted even without that evidence? Well, that was certainly, I think, the view of the lower courts with some of the claims. But that's just a standard prejudice analysis. Here's the to follow up on Judge Pryor's question. I mean, this is sort of an odd case, at least from my perspective, because you've got two pieces of evidence, really, right? You've got the Kirkland testimony and then you've got the forensic evidence tying the gun and then also the bullet casings to the defendant. It's odd because you've just got those two pieces of evidence, but both of those pieces of evidence are really strong, right? So if you, if you just forget the eyewitness, you've still got forensic evidence tying the murder weapon to the defendant. So why wouldn't, just to put a point on Judge Pryor's question, why wouldn't the fact that the gun that was used to commit the murder was in the defendant's possession be enough to convict him in and of itself? I think that goes back to how I started, which is, you know, when you look to the fact that the Forsman Court determined there was insufficient evidence of premeditation and then, of course, you know, when you look to the fact that it was a relatively unaggravated case with a 7 to 5 jury recommendation, I don't think that the State presented a very strong case. And also if you look to, I know I cited in the brief, the manner in which the State argued Kirkland's credibility. Is that, is that really a sentencing issue or a conviction issue? Which, I mean, you talk about the 7 to 5 recommendation, but as I understood it, this ineffective assistance claim, insofar as it's tied to failure to impeach, really is going to conviction, not sentence, right? Oh, yes. No, I didn't mean to suggest that it was a sentencing claim. What I was — what I was hoping to convey was that when you're looking at, you know, how the jury might have viewed this case differently had they been apprised of all this information, that they later came back with a 7 to 5, in my opinion, is just wasn't 12-0, you know, which would have, you know, if it wasn't a unanimous recommendation with 10 aggravators, that is reflective of a much stronger case. I mean, but there had to be a unanimous verdict to convict. Correct. I don't, I don't disagree with that. I see him well into my rebuttal time. You've been on our time, Mr. Sherr. Let's hear from Mr. Rodriguez. Thank you. May it please the Court. My name is Jason Rodriguez, Assistant Attorney General for the State of Florida. I want to begin by kind of clarifying, I think, some things in the record before coming back to Judge Brasher's question about the relation back as it pertains to the George Brown claims. So a couple of things, AEDPA, first and foremost, or Appellant, rather, has argued that for the Kirkland-related ineffectiveness claim, we're on de novo review. We are not under this Court's decision in Hammond v. Hall. So because we did have an underlying decision from the Circuit Court and the Florida Supreme Court did not reject it, we are under the AEDPA for both the deficient performance and the prejudice analysis. That same analysis holds true for the Brown-related ineffectiveness claim because, again, we have a State court, Circuit court, no prejudice ruling. The Florida Supreme Court did not address it, but as Chief Judge Pryor mentioned, the decision is the decision. And in this case, the decision was a no prejudice determination. But the failure to address the deficient performance aspect would be de novo, right? Correct, Your Honor. And I believe that in the State's brief, that was what we actually argued. We said AEDPA deference for the no prejudice determination, de novo review for the deficient performance because I do not have a State court ruling on that. So I did want to clarify those things for the Court, first and foremost. Also, regarding there being, and this will lead into the question Judge Brasher asked, there being no objection to the consideration of the George Brown-related claim below that is incorrect. At least I, in my notes, had it as Doc 30, pages 77 through 81, I believe, was where the State — Say that one more time. Could you say that one more time? I believe it was Doc 30, pages 77 through 81, that the State did object, at least what I have written down. But it really ends up being a red herring because this Court can affirm on any basis that whether the State objected or not at this point is immaterial. If the State — I mean, can't the State waive a statute of limitations argument, though, if they don't — I mean, if the State doesn't raise it? Affirmatively, perhaps, but certainly not when the State is the winner below. If we had lost below entirely the case and we're appealing, then we couldn't raise statute of limitations. Yeah, I guess — I guess for purposes of, like, appellate procedure, I think you're right. I guess my question is, can a State say, you know what, this habeas petition is filed outside the statute of limitations, but we're just not going to raise that? We — you know, we've decided to waive that. And then wouldn't that waiver — could you then just turn around later and raise it on appeal? I think that's a much more difficult question. I — there's a United States Supreme Court case, and I'm going to lose it because it wasn't cited in the briefs, but where the State had actually conceded the issue of timeliness. The district court didn't — and then the district court came back and said, no, this is not timely. And then that went all the way up, and the question was, does district — do district courts have that ability? Was it Day? I'm sorry? Was it Day?  Day. Yes. Davey McDonoghue. Thank you. Yes. Thank you, Judge Rivera. It was about affirming a per curiam decision of our court. I was on the panel. But that's one where the — what the — what the district court was doing was screening before there was even a filing, wasn't it? Your Honor, my recollection and yours is probably better than mine of Day, but no, that became the major issue in Day on the floor of the Supreme — or at the United States Supreme Court, because it was after the State had affirmatively conceded that it was timely, that then the district court said, no, it's not. So I think there actually had been an answer at that point, and the U.S. Supreme Court said district courts still have that ability. That was okay. Yeah, they have that power. Right. I see. I also thought it was — the problem was that the district court decided on statute of limitations grounds without — without giving any kind of notice about it or something to that. I honestly haven't looked at it recently, so I might be remembering it wrong. So my recollection — and again, I certainly defer to the panel on this, but my recollection is that became the Supreme Court's caution to district courts. If you are going to do this, ensure that you give notice and an opportunity to be heard. And the Court noted in Day, if I remember correctly, the Supreme Court noted there had been adequate notice and an opportunity to be heard. That's my recollection of the case. Okay. So certainly I think we could get to a point, especially if the State is appealing the — the grants of a Section 2254 petition, maybe that becomes a harder question. But where the State has prevailed below and the district court has denied relief, we are able to raise this for the first time on appeal. And I think Jennings makes that — Yeah. Well, that — let me — let me follow up on that, then, and ask you if there's any difference between your relation argument — relation back argument with respect to Brown and Gillette. Are they basically the same argument? Fundamentally, it comes down to the same argument, but different facts. So with Gillette, I think — or I apologize, with Brown, we would look at, okay, what facts make this claim tick? What makes it a claim cognizable in Section 2254 proceedings? And when we do that, we find it's Brown's testimony that he got to the store first. That primarily is the aspect of it that makes this claim tick. Without that, you don't have this claim. The issue for Mr. Mungen is he did not mention Brown at all anywhere in the Section 2254 petition. So because that critical fact is absent from the July 2006 petition, this claim cannot relate back. So when we look at it from that perspective, isolating the core operative facts, what makes the facts tick? None of those facts are present in the initial petition. The relation back analysis becomes, I think, very simplistic. But very important at the same time. And so I do want to kind of go into Mr. Mungen's arguments about, well, it relates back broadly to my Claim 1. A claim in Federal habeas, as this Court has repeatedly said, is a specific legal basis tied to a specific factual basis. So merely alleging a broad heading with facts underneath it is not going to be sufficient to allow a claim to relate back. We look at the facts that are beneath that claim. Now, this Court has Dean v. United States, where it was a heading and no facts underneath. And if that was the case here, we'd have a different conversation. But here, Mr. Mungen did allege facts underneath his claim. And so we look to those facts. Those facts deal with impeaching Kirkland with specific pieces of evidence, probation violation, warrants that were issued, the fact that he was still on probation. That's what makes that claim tick. For the ineffective failure to investigate and present, and I do want to clarify, it wasn't exculpatory evidence. It was alibi evidence. He lists four different witnesses that he says counsel should have investigated as alibi witnesses. And those four witnesses are Edward Kimbra, Brian Washington, Philip Levi, and Vernon Longsworth. None of those individuals are named Deputy Gillette. None of those individuals, for purposes of this argument, are named George Brown either. So we have a critical absence in that initial timely file petition. It does not mention or rely on any of George Brown's testimony. George Brown is even more absent than Deputy Gillette, because at least Deputy Gillette was mentioned in the recitation of the penalty phase evidence supporting Mr. Mungen. So it wouldn't relate back on that basis. And I do think that the relation back arguments, and part of the reason States raised them both for Gillette and Brown here, is because this is so critical, properly determining relation back to breaking some of the delays that are occurring in the Federal District Courts. For the Brown-related delay, there was — or for the Brown-related exhaustion, there was extensive delay that was the product of that. For the Gillette-related delay, there was about three years that Mr. Brown got to — or, I apologize, Mr. Mungen got to delay this petition, even after the State began vigorously invoking Mail v. Felix in July of 2020. Still, the District Court allowed continued exhaustion and even allowed Mr. Mungen to take a cert petition to the United States Supreme Court over the State's vigorous objection that cert petitions aren't required to exhaust and that this claim is untimely under Mail. So what would you suggest? I mean, I saw that in your brief, saying that this is a systemic issue. I mean, what would you suggest a District Court should do if someone comes in and says, look, I've got this claim that I found. I would like you to stay this case and let me exhaust it in State court. The District Court is just supposed to say, well, I don't think that's within the statute of limitations anyway, so no? So, no, Your Honor. We need to have litigation up front on the statute of limitations. I think that whenever we have a question about exhaustion, when it's not a claim in the initial timely petition — and remember, that's what Ryan's stays were. It was the filing of a mixed petition, not I've got this new claim that I'd like to go into State court to exhaust. We need to, at that point, I'd like to go in and exhaust. We need to then do a timeliness analysis straight up front to figure out is this claim timely or not. For these, I think the timeliness analysis is actually fairly simple. Again, we have a complete absence of the main testimony and actors in the petition. So either the District Court can do the analysis itself based on its obligation to expedite its docket. It can require briefing from the State and say, what's your position specifically on timeliness? But the thing that a District Court cannot do is what's currently happening in Stein. Hand-waving the time. Although it's not, in fairness, it's not always necessarily obvious at the, you know, front end of a claim that the claim will not be timely. There may be reasons why a claim that would look maybe untimely after discovery would turn out to be timely. You know, diligence, there's no way it could have been known, et cetera, those types of things that you might not be able to know at the outset of the claim. Wouldn't you agree that that can occur in some circumstances? Your Honor, I can't think of them off the top of my head. And part of the reason that I can is most of the claims that I see are ones like this. Well, regardless of what you think of the claims in this case, I mean, you're basically asking us to make a general rule. And that's why I'm asking you, isn't it true that there are some cases where you just can't know from the outset with, you know, any kind of certainty whether the claim is going to be untimely? And, Your Honor, I honestly cannot think of a claim like that, that it would be that unclear. What about a Brady claim? What about a Brady claim that the State has affirmatively hidden and there's, you know, has taken affirmative steps to hide? Well, Your Honor, the analysis would still be the same. We'd be looking at the timely petition and seeing, is there, does this relate back to the timely petition? The timely petition becomes the constant that I'm weighing this Brady claim against. And so if you would need to know what the steps that the State had taken in order to hide it. If the State took affirmative steps to hide a Brady claim of some type, that would have absolutely frustrated any ability of a defendant to discover it in a timely way. Isn't that something that we'd have to take into account? So maybe the only thing that I can, or the way that I can envision that being taken into account would be some type of equitable tolling argument that would be tacked on to the relation back. Perhaps an issue about when the claim accrues? Yes, Your Honor. Would be the other thing. Would looking at when this claim accrues would be another way of looking at it. Either way, I think those are analyses that need to be done up front. Well, let me ask you something else. Is there anything about this case that requires us to make some kind of hold the case in advance to allow for exhaustion? It doesn't seem like there's anything like that about this case that requires us to do that. Your Honor, requires probably is a stronger word than I can urge on this Court. I do think that 16 years in Federal District Court on untimely claims does cry out for some type of resolution. And when we look at what the United States Supreme Court has done in Ramirez and Twyford, when they see needless delays, they do actually speak out. And this Court has that power. I cited a case in the brief where this Court has addressed issues even when they are not properly before it, as this Court says. So I think ultimately what you're saying is you would like for us to address it, but we could decide this case without coming up with some general rule, right? Is that fair? Yes, Your Honor. I think that is fair. I think it goes a little bit to Judge Pryor's point about all of the ineffectiveness claims. You could pretty easily just decide there's no prejudice here and everything fundamentally really goes away. Maybe the Gillette one kind of sticks around for a little bit, but you still have the same problem with the gun being found in Mungin's room. At most, we would eradicate two shell casings in the Dodge Monaco. That was found 75 to 100 feet from the place that he was located. Can I ask you a question about an argument you make in your brief? So you argue that with respect to the Brown claim, that it was not sufficiently raised by the petitioner. I'll just tell you, I'm having a hard time sort of understanding that claim because they do mention the Sixth Amendment specifically in the headings of their brief. So I get the idea about a footnote. You know, you can't really raise things in footnotes. I think it's a matter of 11th Circuit law that we don't have to read footnotes in briefs. So I'll just, that's my view. But the headings, though, I mean, if you say something in the heading, like that seems like you raised it. What do you say about that? So no, you can't raise a claim in a heading. And I think these headings are a good illustration. My Sixth Amendment right to counsel, and actually I don't even go that far, my trial was a violation of the Sixth Amendment. Well, that tells me nothing about what makes an effectiveness claim. I can't analyze that. I don't know exactly what you're talking about. The other one, the more clear one, if I was to put that in quotes, is alternatively my counsel was ineffective regarding the Brown affidavit. That's the language that we have. And Brady, Strickland, and Gigliar are not just alternatives that get to be thrown around. Yeah, but I mean, here, though, the argument is basically, look, defense counsel didn't have this information and they should have. So that's either a Brady violation because the government didn't give it to him or it's an effective assistance because they didn't pursue it sufficiently to get it. And then the facts are the same. You know, what you're arguing about is the same no matter whether you look at it under Brady or an effective assistance. I mean, why isn't that? I'm not saying it's, like, the right way to brief things, you know, a bad idea, but why isn't that enough to just put the court on notice that, look, in the alternative they're saying this is an effective assistance of counsel claim? But, Your Honor, I think that actually I dispute the premise of the question that it's all the same facts. When we're talking about why counsel did or did not do something, I need to know what was going on in counsel's mind. In this case, we actually had counsel that did effectively try to find George Brown. And went and filed an affidavit with the State court saying, I deposed Kahn, I did not look or I didn't seek further for that for Brown afterwards. Ultimately, counsel's reasons matter in a way that they actually don't with a Brady claim or a Giglio claim. The State hides evidence. Well, it doesn't matter whether it did it intentionally or unintentionally. But counsel's rationale for doing something is critical to determine whether he was ineffective. And you can have a case, like I think the one that you have here, where all of the actors, the State and defense counsel, thought they knew what Brown was going to say, and it just turns out that ended up not being the case years and years later. So you — they're not true alternatives. You can't just bounce Brady, Giglio, Strickland. There are different facts that make a counsel claim tick, because counsel's actions are, in part, guided by, what is the State telling me about what this witness is going to say? And when you've got an affidavit from counsel saying, I had no clue that Brown would have said any of this, I think it becomes clear these are not really alternatives. So headings and footnotes are never enough to exhaust a claim. And I do think that is a fairly clear rule this Court should adopt. This Court has the rule already. It does not read footnotes. Just telling me a heading about what we're supposedly going to talk about. Well, I don't know about a categorical rule about headings. When you — you should read some of our briefs and see very long headings. And maybe a heading could be several pages long. That may be true in your headings. It may be true in the headings for your briefs, but I can assure you, we get some headings that look like paragraphs. Well, that may raise different issues, but I think that when we're talking about an argument that counsel is raising, it needs to be in the body. That's where the important stuff is. Headings tell you what you're going to talk about. Footnotes tell you asides that are not critical to the resolution. Headings and footnotes are not sufficient to — Yeah. I mean, what do you say to their argument on this, that the trial court addressed this issue as a Strickland issue? I mean, okay, let's assume — I don't think we can adopt a categorical rule that says a heading is not sufficient to preserve or raise something because you don't know what the heading says. But, you know, their argument is, look, the trial court addressed this as a Brady issue, as a Giglio issue, and as a Strickland issue. And then we filed a brief and we said in the heading to this argument that we were raising it as a Giglio issue, a Brady issue, and a Strickland issue. Like, why isn't that enough? As this Court is well aware, parties can choose not to appeal or waive issues that they lost in the dispute. Yeah, but I mean, this isn't a situation — I get your point about the difference between Giglio and Brady and Strickland. Like, it's true. I mean, they're different standards. Obviously, they're different tests. But we're not saying this was sufficient to win this case in front of the Florida Supreme Court. We're just saying is it enough to raise the Strickland issue? And it just seems really — I don't know, when the trial court addressed it as a Strickland issue and when the heading addressing this issue says Strickland, gosh, why isn't that enough to raise it as a Strickland issue? Well, Your Honor, because there's nothing in the body that would support that. And it was not raised just as a Strickland issue. It was a violation of four different amendments to the United States Constitution in one heading. It was a Brady, Giglio, and Strickland issue in the alternative in a secondary heading. And then it was a footnote. That is not sufficient to exhaust the claim before the Florida Supreme Court. And I do want to be very — One final question on this. So the trial court here said the reason it denied the Brady, Giglio, and ineffective assistance was that this evidence was not going to change the result. That was the trial court's reasoning. Isn't that the same — and that's what the Florida Supreme Court reversed, right? Isn't that the exact same question, whether it's Brady, Giglio, or Strickland? In other words, the trial court rejected all of them for the same reason. They raised their challenge to that for all the same reason. And then the Florida Supreme Court reverses for the same reason. Why isn't the Strickland claim in there for that? Well, Your Honor, you would still — and even if they would have pled that separately and done, okay, my Strickland prejudice analysis is identical to my Brady analysis and done that actually in the body, with everything else, that might be enough in the body, not in headings and a footnote, because those kind of claims get missed. And I do think it's important to remember, and this is on — But if they're exactly the same analysis, that is — I mean, either there's prejudice or there isn't prejudice, right? It doesn't — it's not like with — when you have to look at the reasons for why counsel did something on the performance prong, for example. There's either prejudice or there isn't prejudice. And so if it's going to be exactly the same analysis, why isn't it enough to just identify the three claims under which you're saying there's enough prejudice? So, Your Honor, I want — Even in a heading. Your Honor, I want to take a step back and talk a little bit in getting to answer your question about why we require exhaustion. And it's because this Court has said we want State courts to have a fair opportunity to deal with the claims. The problem with, even when you've got the same analysis, a claim that's raised exclusively in footnotes and a heading is it becomes very easy to miss. And what the Florida Supreme Court did here, I think, clearly demonstrates it was actually missed. The Florida Supreme Court, on page 734 of the opinion regarding the George Brown-related claims, the 2011 opinion, said here, meaning on appeal, Mungin has raised three claims pertaining to the Brown affidavit. State violated Brady in failing to disclose favorable evidence pertaining to Brown. The State violated Giglio by failing to knowingly — by knowingly presenting false evidence. And Brown's affidavit constitutes newly discovered evidence that mandates a new trial. That's how the Florida Supreme Court actually understood the claims that he was raising. And when you just present to a court headings in a footnote, which Florida's Supreme Court's law does not allow footnote claims or conclusory claims, which the headings would fit into that category, that's not enough. It's too easy to miss the claims. And if we want State courts to have a fair opportunity to pass on the issue, you have to actually set out the issue. You can refer back, I think, to your Brady analysis and say, in the body, my alternative Strickland claim heading, the analysis for this Brady claim is ultimately the same, cite Kyles v. Whitley, and, therefore, I adopt the same arguments as a part of my Sixth Amendment claim. I think you could do that in the body, not in headings in a footnote. Florida Supreme Court does not allow conclusory claims and doesn't allow footnote claims similar to this Court. So I do not believe this was enough to exhaust. And it runs the risk of doing exactly what happened here, a court that missed the claim. So, Your Honors, I just want to make sure that I — Your Honors, I believe that I've addressed everything that I need to address here. Unless the Court has further questions, then I will yield the balance of my time. Roberts. Splendid. Thank you, Your Honor. Thank you, Mr. Rodriguez. Mr. Scherr, you've saved some time for rebuttal, eight minutes. Thank you. Just a few points on that last discussion. Obviously, yes, exhaustion — the purpose of exhaustion is to alert the State courts and the opposing counsel of what the claim is. Here, the Circuit Court understood that there was an ineffectiveness claim relating to George Brown, ruled on it on the merits, and so there's no mistake here or hiding the ball in a footnote. Circuit Court found it. We raise it in the appeal. That's it. The Floorsman Court sometimes makes mistakes in how they delineate issues. This wouldn't be the first case. And so sometimes it happens. And clearly, the claim was raised as a district court ruled. The district court at least silently rejected this argument on behalf of the State. I do want to point out, in terms of the court had asked me some questions and also the State about, you know, sort of the overall prejudice here, and I do want to point out that Kirkland's identification was very, very, very weak. Yeah, and weakened on cross-examination. Well, not — It just doesn't seem like it played — it could have played much. But when you look at the cross-examination, certainly that's what the district court determined. When you look at the cross-examination, Kirkland never came off of his testimony. When he was confronted with inconsistencies, for example, he said, oh, I don't remember, or that was a couple of years ago. So the trial court — excuse me, the trial counsel only impeached Kirkland with his deposition once during that entire cross-examination. All of the rest of the questions that counsel asked him, which would have undermined his identification, he sloughed off or claimed not to remember. And so there was no sort of realization by Kirkland or evidence to suggest that Kirkland had come off of his identification. But on cross-examination, he confirmed he told Kahn on the day of the crime he wasn't sure if he would be able to recognize the man he saw leaving the store again, confirmed it took him about 15 to 20 minutes to select Mungin from the photo lineup, and did not deny he told Kahn he was unable to swear that the photo of Mungin was the same man he saw leaving the store, which is roughly the same, right? I disagree with some of those characterizations. I don't think he agreed that's what he told Kahn. I think he came off of that. Did not deny is what I said. He qualified it in such a way as to make it appear that he did not tell her that or that it was a couple of years ago. He didn't confirm what counsel was characterizing. He, again, he just sort of shrugged it off as either something that happened a long time ago or claiming not to remember. I mean, of course, part of this also goes to the first claim about Kirkland, which is the failure to impeach with some of his criminal history, because that would have further undermined his credibility. So we have a weak identification. Let me also add with Kirkland's identification. The State presented evidence, which Mr. Mungin didn't contest, of two incidents that happened two days before the murder in Jacksonville for the reason why we're here. The identifications given by those witnesses in the Monticello and in the Tallahassee cases could not be more different in almost every single way than the description that Kirkland gave. There's no way that Mr. Mungin, two days before the murder in Jacksonville, suddenly grew jerry curls, suddenly grew a beard, suddenly aged or decreased in age by almost a decade, suddenly became six or seven inches shorter or taller. It's impossible. Those two descriptions are completely at odds with each other. So I really want to impress on the Court how weak this identification was. And, of course, when you look at the progression of Kirkland's identification over the course of time, it becomes stronger as he's having more legal problems and as things get closer to trial. All of that needs to be considered when you look at the strength of his identification. In terms of the forensic evidence, this is precisely why the Gillette claim is so important, because the Gillette claim undermines the State's forensic ballistics case in terms of those two shell casings that the State presented at trial as being found in that car near where Mr. Mungin was arrested. Initially, and what the jury didn't know, was that Deputy Gillette did not see those two shell casings. And then as it developed at the hearing, the lead detective on the case said, well, maybe I saw one. I don't really know. And then later on, suddenly two shell casings appear. Now, all of the shell casings that were attributable to the bullets in these cases were all collected. So where did these two shell casings come from? As trial counsel explained, this would arm a competent defense lawyer to make the argument that there's something awry with the State's ballistics case. Because, yes, it was, you know, they have the, you know, the Williams rule evidence was only admitted for the purpose of identity, not for guilt on this case. And so I think all of that combined, when you have information that the jury didn't hear about from Kirkland that would have related to his credibility, when you hear about testimony from George Brown, which also really cannot be reconciled with Kirkland's version of events, those two things could not possibly both have happened. And you have these two shell casings that initially were not there that suddenly are there. All of that would give a jury, I think, pause to, especially a jury who the Court had already said did not have sufficient evidence to render a premeditated murder verdict, I think that would have undermined confidence in the outcome. And so I submit all of that together really does result in habeas being granted here. And as to the statute of limitations argument relating to George Brown, the Respondent cited Docket Entry 30. That's actually the second habeas petition itself. So I'm not sure, and, again, I rely on the record, but I went through their response in preparation for this argument. I did not see that they made a statute of limitations relation back argument as it relates to George Brown. So, again, if my memory isn't correct, I'll rely on the pleadings, but I don't believe that to be the case. Otherwise, we would have litigated that below. It just wasn't an issue. They may have objected, and I'm sure they did object to the abeyance, but that's different than actually the relation back. And finally, just in terms of the Gillette issue, what the Respondent never really tells the Court is that it did not oppose the stay and the abeyance for the Gillette 3851 motion. The District Court entered a status order requiring both parties to address what should happen in this case, and Mr. Mungeon filed his, informing the Court of the filing of this 3851 motion relating to Deputy Gillette. The State did not comply with the District Court's order, did not even respond, and I think the District Court, correctly so, probably could have assumed that they had no objection, and so, therefore, that abeyance was entered. And so, they can't now complain that an abeyance was entered when they didn't object to it in the first place. Thank you very much. Thank you, Mr. Sherr. We're adjourned.